# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO
Senior Judge Marcia S. Krieger

Civil Action No. 18-cv-02417-MSK

JESSE RAY ACEVES,

    Plaintiff,

v.

COMMISSIONER, SOCIAL SECURITY ADMINISTRATION,

    Defendant.

## OPINION AND ORDER REVERSING AND REMANDING THE COMMISSIONER'S DECISION

**THIS MATTER** comes before the Court on the Plaintiff's Complaint **(#1)**, the Plaintiff's Opening Brief **(#14)**, the Defendant's Response **(#15)**, and the Plaintiff's Reply **(#16)**. For the following reasons, the Commissioner's decision is reversed, and the matter is remanded for further proceedings.

## I. JURISDICTION

The Court has jurisdiction over an appeal from a final decision of the Commissioner under 42 U.S.C. § 405(g).

## II. BACKGROUND

### A. Procedural History

Plaintiff Jesse Aceves ("Mr. Aceves") seeks judicial review of a final decision by the Defendant Commissioner ("Commissioner") denying his application for supplemental security

1

income ("SSI") under the Social Security Act. In June 2015, Mr. Aceves filed for SSI, claiming he became disabled as of December 20, 2014. **(#11-5 at 219)**. His application was denied, and he requested an administrative hearing. Following a hearing before an Administrative Law Judge ("ALJ"), Mr. Aceves received an unfavorable decision in August 2017 ("Decision"). **(#11-2 at 12-25)**. Mr. Aceves appealed that Decision to the Appeals Council. However, on July 26, 2018, the Appeals Council denied his Request for Review. **(#11-2 at 1)**. Mr. Aceves now appeals the final agency action to this Court.

**B.     Factual Background**

The Court offers a summary of the facts here and elaborates as necessary in its discussion. Also, because the dispositive issue in this appeal concerns the weight given to the treating physician's opinion as to Mr. Aceves' physical impairments, the Court summarizes only the medical evidence relevant to its decision.

At the time of his alleged onset of disability, Mr. Aceves was 51 years old. He was 53 years old at the time of the administrative hearing before the ALJ. **(#11-5 at 219; #11-2 at 44)**. Mr. Aceves has a high school education and was previously employed as a dishwasher, busser, stocking clerk, and construction flagger. **(#11-6 at 296; #11-2 at 36-41)**.

Mr. Aceves suffers from a congenital defect known as kyphosis and scoliosis in his spine ("kyphoscoliosis"[1]), which causes him chronic back pain, decreased lung capacity, and nighttime hypoxia. **(#11-7 at 326-379)**.

---

[1]     Kyphoscoliosis is defined as "[a]n abnormal curvature of the spine in both a coronal (lateral) and sagittal (back-to-front) plane." *See* https://www.ncbi.nlm.nih.gov/medgen/154361 (last visited August 28, 2019).

In March 2014, Deborah Brown, M.D., Mr. Aceves' treating provider, saw Mr. Aceves for his chronic lower back pain caused by scoliosis. Dr. Brown noted that Mr. Aceves experienced a constant dull ache associated with muscle spasms, and he could not stand or walk for prolonged periods of time. Dr. Brown reported that the pain medication Tramadol was working well for Mr. Aceves' pain, and he was able to manage activities of daily living and do limited household chores. He was also participating in physical therapy sessions. **(#11-7 at 345-347)**. Upon her examination, Dr. Brown noted Mr. Aceves had a normal gait, but found "severe kytosis and rotation" along with a limited range of motion due to "severe curvature" of the spine. **(#11-7 at 347)**. She also noted tenderness over the sacroiliac joints and muscle spasms in his "lumbar paraspinal muscles." **(#11-7 at 347)**. Dr. Brown diagnosed Mr. Aceves with kyphoscoliosis, chronic pain, and tachycardia. She referred Mr. Aceves to physical therapy; prescribed pain medications; and ordered chest x-rays, blood tests, a sleep study, and a pulse oxygen report. **(#11-7 at 347)**. Then, Dr. Brown completed Mr. Aceves' disability paperwork and scheduled him for a follow up appointment. **(#11-7 at 347)**.

The March 17, 2014 pulse oxygen report showed Mr. Aceves had 93% oxygen saturation after six minutes of exercise. **(#11-7 at 358)**. The March 2014 chest x-rays revealed "old-appearing compression fractures or wedge deformities;" "increased kyphosis involving the thoracic spine;" and "mild osteoarthritic changes involving the thoracic spine." **(#11-7 at 387)**. The sleep study showed hypoxia and sleep apnea (when Mr. Aceves slept on his back), and it was recommended that Mr. Aceves use supplemental oxygen at night and avoid sleeping on his back. **(#11-7 at 348-357)**.

In June 2014, Dr. Brown saw Mr. Aceves again for his kyphoscoliosis, which caused him

3

"worsening" daily back pain and numbness and tingling in his feet.  **(#11-7 at 341)**.  Upon her examination, Dr. Brown noted abnormalities with Mr. Aceves': general posture (antalgic gait and humpback); neck (limited range of motion); lungs (decreased breath sounds); gait and station; severe kyphosis; deep lordosis[2]; chest (barreled); and neurologic sensation.  **(#11-7 at 343-344)**.  Dr. Brown assessed Mr. Aceves with: (1) worsening lower back pain; (2) a new onset of numbness or burning; and (3) hypoxia or a lack of oxygen due to his pectus carinatum[3]. **(#11-7 at 344)**.  Dr. Brown ordered another pulse oxygen report (which was conducted that same day), which showed that he had 89% oxygen saturation after six minutes of exercise. **(#11-7 at 355)**.  She further ordered MRI tests of Mr. Aceves' spine and additional x-rays. Following her examination, Dr. Brown opined that Mr. Aceves is "not able to maintain [full time] employment" as his medical conditions would be aggravated by "prolonged sitting, standing, walking and [are] complicated by hypoxia."  **(#11-7 at 344)**.

The June 2014 x-rays revealed "no significant change when compared to the chest x-ray of March 18, 2014."  **(#11-7 at 385)**.  The MRI of Mr. Aceves' thoracic spine showed "mild degenerative changes without significant stenosis or neuroforaminal narrowing."  **(#11-7 at 377)**.  The MRI of Mr. Aceves' lumbar spine showed "mild broad-based posterior bulge and

---

[2]  Lordosis or swayback occurs when the spine curves too far inward.  *See* https://www.cedars-sinai.org/health-library/diseases-and-conditions/s/swayback-lordosis.html (last visited August 28, 2019).

[3]  "Pectus carinatum is an uncommon birth defect in which a child's breastbone protrudes outward abnormally.  Sometimes the deformity isn't noticeable until after the adolescent growth spurt.  For most children and teens, the main issue with pectus carinatum is the way it looks." *See* https://www.mayoclinic.org/diseases-conditions/pectus-carinatum/symptoms-causes/syc-20355531 (last visited August 28, 2019).

mild facet hypertrophy" at L4-L5 resulting in "mild stenosis" and "mild posterior and right lateral disc bulge and mild facet hypertrophy" at L5-S1 resulting in "mild stenosis and right neuroforaminal narrowing. Due to the disc laterally, there may be impingement on the existing right L5 nerve root." **(#11-7 at 380-381)**.

In July 2014, Dr. Brown referred Mr. Aceves to neurosurgeon Lee Krauth, M.D. Upon a review of Mr. Aceves' MRI tests, Dr. Krauth opined that Mr. Aceves had "mild degenerative changes in the spine and in the joints but nothing that is that out of the ordinary for someone 50 years old." **(#11-9 at 530)**. Dr. Krauth found no disc herniations, cauda equina compressions, or cord compressions and noted a normal sacrococcygeal region. Dr. Krauth concluded that "there is absolutely no significant surgical pathology on any of these studies and I basically feel that they are not really that abnormal for someone in his age group who is a smoker." **(#11-9 at 530)**. Upon an examination of Mr. Aceves, Dr. Krauth noted normal cranial nerves, deep tendon reflexes, motor strength, gait and station along with a "barrel chest and … a bit of exaggerated kyphosis." **(#11-9 at 530)**. Dr. Krauth opined that Mr. Aceves' MRI tests are "really not that abnormal, and I do not see any reason to limit his activities, based on any spine disease." **(#11-9 at 530)**. Dr. Krauth recommended an exercise program and anti-inflammatory medications for Dr. Aceves' chronic pain and further opined that he did not believe Mr. Aceves was "disabled from any employment … and could be gainfully employed if he so desired." **(#11-7 at 530)**.

The record reflects that between June 5, 2014 and November 14, 2014, Mr. Aceves participated in more than 20 physical therapy sessions. The physical therapist noted Mr. Aceves' diagnoses of kyphoscoliosis, scoliosis, and constant back pain. **(#11-9 at 557)**.

5

Physical Therapy Visit Notes from June 19, 2014 reflect that Mr. Aceves continued to demonstrate poor posture and would "cramp up during treatment requiring extra rest breaks." **(#11-9 at 569)**.

In March 2015, Dr. Brown again saw Mr. Aceves for chronic pain related to his scoliosis. **(#11-7 at 338)**. Upon her examination, while she noted a normal gait, she also noted "severe kyphosis and rotation," limited range of motion "secondary to severe curvature," tenderness, and mild muscle spasms in the lumbar area. **(#11-7 at 340)**. Dr. Brown refilled Mr. Aceves' pain medications and completed his paperwork. In May 2015, Dr. Brown saw Mr. Aceves again following an emergency room visit for a psychotic breakdown after a period of heavy marijuana use. **(#11-7 at 334)**. Dr. Brown recommended Mr. Aceves cease all use of marijuana and ordered lab testing. **(#11-7 at 335-336)**. In June 2015, Dr. Brown treated Mr. Aceves for pre-diabetes. **(#11-7 at 330)**. In August 2015, Dr. Brown saw Mr. Aceves for a follow up appointment on his blood sugars. **(#11-7 at 326)**. She noted a normal physical exam and "no complaints" by Mr. Aceves. **(#11-7 at 326-329)**. In September 2015, Dr. Brown saw Mr. Aceves again and administered hepatitis A and B immunizations. **(#11-8 at 464)**.

In November 2015, Dr. Brown completed a "Medical Source Statement" for Mr. Aceves, noting that she has consistently treated Mr. Aceves since 2010. **(#11-10 at 612)**. She opined that he suffers from: kyphoscoliosis; chronic pain; hepatitis C with elevated liver function tests; pre-diabetes; and sleep-related hypoxia. She noted Mr. Aceves has a "fair prognosis" and suffers from dull and achy back pain (due to the kyphoscoliosis) and headaches and fatigue (due to the sleep related hypoxia). She opined that while Mr. Aceves' back pain waxed and waned, it was aggravated by activities involving: bending, lifting, carrying, pushing, and pulling as well as

6

prolonged sitting, standing, or walking.  (**#11-10 at 612**).  As to Mr. Aceves' functional capacity to work in a competitive situation, she limited him to: 15 minutes of sitting and standing at one time for a total of less than two hours in a workday; walking less than a block; working in a job where he can shift positions at will from sitting, standing, and walking; working in a job with breaks every 15 minutes for 15 minutes at a time due to muscle weakness, chronic fatigue, pain, numbness, and adverse effects of medication.  (**#11-10 at 613**).  Dr. Brown further limited Mr. Aceves to lifting 10 pounds occasionally and never lifting more than 10 pounds.  She stated he should never: twist; stoop; crouch; climb stairs or ladders; operate a motor vehicle; kneel; or balance.  Further, Mr. Aceves should never be exposed to: unprotected heights; moving mechanical parts; humidity and wetness; dust; fumes; gases; pulmonary irritants; extreme temperatures; or vibrations.  (**#11-10 at 613-615**).  Finally, Dr. Brown opined that Mr. Aceves was incapable of performing even "low stress" work and would be "off task" for more than 25% of the workday.  (**#11-10 at 615**).

In February 2016, Dr. Brown saw Mr. Aceves for a follow up appointment.  She noted his chronic pain was controlled by pain medications but was concerned about his nutrition and activity level.  (**#11-10 at 631-635**).  She also saw him again in March 2016.  She noted his chronic pain related to scoliosis and upon examination, Dr. Brown found "severe lordosis, kyphosis and rotation, ROM limited secondary to severe curvature" and tenderness in the joints and "muscle spasms" in the lumbar muscles.  (**#11-10 at 637-638**).  In March 2017, Dr. Brown saw Mr. Aceves and noted no changes to his constant and daily pain.  She ordered more physical therapy.  (**#11-10 at 680-683**).  Mr. Aceves attended physical therapy in June 2017, and the therapist observed Mr. Aceves': significant forward head posture; increased cervical

7

lordosis; severe thoracic kyphosis; and increased lumbar lordosis. **(#11-2 at 96)**. In August 2017, Mr. Aceves was ultimately discharged from physical therapy "due to lack of progress." **(#11-2 at 96)**. The therapist noted that Mr. Aceves' back pain "seems mostly soft tissue related from chronic postural deviation with muscle imbalance," and while he would benefit from strengthening exercises, physical therapy "will not be able to significantly change his spinal positioning." **(#11-2 at 98)**.

**C.  The ALJ's Decision**

SSI is available to an individual who is financially eligible, filed an application for SSI, and is disabled as defined in the Act. 42 U.S.C. § 1382. An individual is determined to be under a disability only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy …." 42 U.S.C. § 423(d)(2)(A). The disabling impairment must last, or be expected to last, for a least 12 consecutive months. *See Barnhart v. Walton*, 535 U.S. 212, 215 (2002).

To determine disability, the ALJ analyzed this case pursuant to the sequential five-step inquiry. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1998) (explaining the five steps in detail). On August 17, 2017, the ALJ issued a Decision unfavorable to Mr. Aceves. At step one, the ALJ found he had not engaged in substantial gainful activity since March 6, 2015. **(#11-2 at 17)**. At step two, the ALJ found Mr. Aceves had the following severe impairments: lumbar degenerative disc disease with kyphoscoliosis, mild thoracic degenerative disc disease, sleep-related hypoxia/obstructive sleep

apnea, and hepatitis C. **(#11-2 at 17)**. At step three, the ALJ found Mr. Aceves did not have an impairment that met or medically equaled the presumptively disabling conditions listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. **(#11-2 at 19)**. The ALJ then assessed Mr. Aceves' RFC and determined that:

> [Mr. Aceves] has the residual functional capacity to perform a reduced range of light work as defined in 20 § C.F.R. 416.967(b) as follows: the claimant can lift and carry twenty pounds occasionally and ten pounds frequently; the claimant can stand and/or walk for six hours out of an eight hour work day; sit for six hours out of an eight hour work day; he can never climb ladders, ropes, or scaffolds; the claimant can frequently stoop, kneel, crouch, crawl, and climb ramps or stairs; the claimant cannot handle food or perform food preparation; and the claimant cannot perform commercial driving or the operation of heavy machinery.

**(#11-2 at 20)**. In crafting Mr. Aceves' RFC, the ALJ gave "little weight" to Dr. Brown's 2015 opinion and "substantial weight" to Dr. Krauth's 2014 opinion. **(#11-2 at 23)**. At step four, the ALJ found Mr. Aceves was capable of performing his past relevant work as a construction flagger. **(#11-2 at 24)**. Thus, the ALJ's analysis ended at step four with the finding that Mr. Aceves was not disabled as defined by the Social Security Act.

### III. STANDARD OF REVIEW

Though the Court's review is *de novo*, the Court must uphold the Commissioner's decision if it is free from legal error and the Commissioner's factual findings are supported by substantial evidence. *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005). Substantial evidence is evidence a reasonable person would accept to support a conclusion, requiring "more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). The Court may not reweigh the evidence, it looks to the entire record to determine if substantial evidence exists to support the Commissioner's decision. *Wall v. Astrue*,

561 F.3d 1048, 1052 (10th Cir. 2009).

## IV. DISCUSSION

Mr. Aceves asserts several issues in his appeal. First, he contends that the ALJ's Decision did not properly weigh the medical opinion evidence and failed to state valid reasons for rejecting treating physician Dr. Brown's November 2015 RFC opinion.[4] Second, Mr. Aceves claims that the ALJ's Decision regarding the consistency of his testimony was not supported by substantial evidence. Third, Mr. Aceves argues that he could not perform the job of construction flagger within the limitations set forth in the ALJ's RFC findings. Finally, Mr. Aceves states that the new evidence submitted to the Appeals Counsel requires a remand. **(#14 at 2)**. Because the first argument is dispositive and requires remand, the Court will focus on it. *See Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003) (declining to address remaining issues on appeal as "they may be affected by the ALJ's treatment of this case on remand.").

A treating physician's opinion is generally entitled to controlling weight if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Romo v. Commissioner*, 748 Fed. Appx. 182, (10th Cir. 2018) (citing 20 C.F.R. § 404.1527(c)(2));[5] *Pisciotta v. Astrue*, 500 F.3d 1074, 1077 (10th Cir. 2007). However, even if a treating physician's opinion is not entitled to controlling weight, it is still entitled to deference, and the ALJ must consider:

---

[4] Mr. Aceves does not challenge the ALJ's assessment of Dr. Brown's June 2014 opinion.

[5] Pursuant to a change in the Social Security Administration's regulations, effective March 27, 2017, treating physician opinions will no longer be given controlling weight. However, the prior rule remains applicable to claims—like Mr. Aceves'—filed before that date. Rescission of Social Security Rulings 96–2P, 96–5P, and 06–3P, 2017 WL 3928298, at *1 (2017).

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004) (internal quotations omitted). In applying these factors, the ALJ must make findings and reasoning sufficiently specific so the weight given to the medical source's opinion is clear to subsequent reviewers. *Id.*

Here, the ALJ's Decision determined that Dr. Brown's 2015 opinion was not entitled to controlling weight, and instead gave it "little weight." **(#11-2 at 23)**. In the Decision, the ALJ stated:

> As for opinion evidence, I considered the opinions of Deborah Brown, M.D., and give it minimal weight. Dr. Brown opined in June of 2014 that the claimant was unable to work due to scoliosis complicated by hypoxia. … After review, I find Dr. Brown's opinion to be conclusory, with no functional analysis of the claimant's limitations. Dr. Brown again opined in November 2015 that the claimant's functionality was well below the sedentary level of exertion, assessing the claimant as able to occasionally lift no more than 10 pounds, sit or stand no more than two hours in an eight-hour day, never being able to perform postural activities, having unspecified manipulative limitations, being off-task more than 25% of a workday, being incapable of even low-stress jobs, never having any exposure to any environmental conditions, and likely missing more than 4 days of work per month. … I find this in direct contradiction to her own treatment notes of March 2017 as well as other examinations wherein she describes the claimant as having a normal gait, with good bulk, tone and optimal muscle strength at 5+/5 rather than a mere 5/5, and that his pain is well controlled through medication. … Therefore, I afford her opinions little weight as they are not supported by the record, including her own treatment records; are based almost entirely on the claimant's subjective reports rather than any objective observations made by Dr. Brown; and are completely inconsistent with his retained function throughout the record, including riding a bike, doing housework, being able to manage his activities of daily living and personal care, and having a hobby of metal detecting.

**(#11-2 at 23)**.

In response, the Commissioner argues that the ALJ properly evaluated Dr. Brown's[6] opinion and reasonably found it was not well-supported by the "mild diagnostic findings and minimal clinical examination findings." **(#15 at 9)**.

It is clear from the Decision that the ALJ did not engage in the two-step process necessary to determine whether Dr. Brown's 2015 opinion was entitled to controlling weight. This was legal error. However, it is harmless if the reasons given for rejecting her opinion satisfy either of the grounds for giving her opinion less than controlling weight. When an ALJ rejects a treating physician's opinion, he/she must identify specific, good reasons for weight given to the opinion. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004). This requires identification of specific evidence in the record that the ALJ found to be inconsistent with Dr. Brown's opinion, as well as demonstration that consistent evidence was considered. *See Clifton v. Chater*, 79 F.3d 1007 (10th Cir. 1996).

As to the ALJ's first inquiry—whether the opinion is supported by medically acceptable clinical and laboratory diagnostic techniques—the record is replete with instances where Dr. Brown ordered objective medical testing such as chest x-rays, MRIs, blood tests, pulse oxygen tests, and sleep studies. The 2014 chest x-rays showed fractures, deformities, increased kyphosis of the spine, and mild osteoarthritic changes involving the thoracic spine. **(#11-7 at 387)**. The MRIs showed mild degenerative changes of the spine along with mild stenosis and right neuroforaminal narrowing with possible impingement on the right L5 nerve root. **(#11-7**

---

[6] In arguing that the ALJ properly weighed Dr. Brown's opinion, the Commissioner erroneously referred to Dr. Brown as Mr. Aceves' "treating nurse" and "Ms. Brown." **(#15 at 11-12)**. This inaccuracy does nothing to bolster the Commissioner's arguments.

12

**at 377; #11-13 at 598**). These objective test results are consistent with Dr. Brown's own observations and examinations of Mr. Aceves in March 2014, June 2014, March 2015, November 2015, and March 2016. **(#11-7 at 339-345; #11-10 at 612-638)**. Dr. Brown also repeatedly referred Mr. Aceves to physical therapy, and in 2014 and 2017, Mr. Aceves participated in numerous sessions. Indeed, Dr. Brown's decision to order physical therapy was in line with Dr. Krauth's opinion that Mr. Aceves needed to engage in more exercise to combat his chronic pain. **(#11-7 at 530)**. Like Dr. Brown, Dr. Krauth also observed Mr. Aceves' barrel chest and exaggerated kyphosis. **(#11-9 at 530)**. Also consistent with Dr. Brown's findings, the physical therapist observed Mr. Aceves' postural abnormalities, cervical and lumbar lordosis, and severe thoracic kyphosis. **(#11-2 at 96)**. Thus, the Court finds Dr. Brown's opinions were supported by medically acceptable clinical and laboratory diagnostic techniques.

The Court now turns to the ALJ's second inquiry—whether Dr. Brown's opinion is inconsistent with the other substantial evidence in record. Importantly, the record contains no medical opinions (other than Dr. Brown's) that addressed Mr. Aceves' physical RFC. Although the ALJ gave significant weight to Dr. Krauth's opinion, Dr. Krauth did not make any functional findings. After reviewing the MRI tests and examining Mr. Aceves one time,[7] Dr. Krauth merely opined that Mr. Aceves' MRI tests were "not that abnormal," which is inconsistent with both Dr. Brown's findings and the MRI results that noted "degenerative changes with stenosis, neuroforaminal narrowing and possible nerve root impingement." **(#11-7 at 381)**.

Further, the record does not support the ALJ's stated reason for discrediting Dr. Brown's

---

[7]    Mr. Aceves testified at the administrative hearing that Dr. Krauth only examined him for "a minute or two." **(#11-2 at 56)**.

13

opinion—that it is inconsistent with her March 2017 treatment notes and other examinations, which reflect that Mr. Aceves' condition was not that severe and that his pain was controlled with medications. The March 2017 treatment note reported Mr. Aceves' pain was well-controlled through medication and that he had a normal gait, good bulk, and muscle tone "MS5+/5." **(#11-10 at 682)**. However, this treatment note is a snapshot in time; it does not represent the longitudinal record of the period over which Dr. Brown treated Mr. Aceves. For example, previous treatment notes (June 2014, March 2015, and March 2016) along with the March 2017 treatment note reported Mr. Aceves' severe lordosis, kyphosis, limited range of motion, joint tenderness, and muscle spasms. **(#11-10 at 682; #11-7 at 343-344; #11-10 at 637-639; #11-7 at 340)**. The treatment notes also reflected Dr. Brown's repeated prescriptions for pain medication, objective testing, and physical therapy in an effort to alleviate Mr. Aceves' chronic pain. Thus, contrary to the ALJ's characterization, the March 2017 treatment note does not paint an unambiguously rosy picture of improvement of Mr. Aceves' physical condition. While this Court may not reweigh the medical evidence and must defer to the ALJ's resolution of evidentiary conflicts, the ALJ's failure to identify any conflicting medical evidence or consider the longitudinal record was improper. *Carpenter v. Astrue*, 537 F.3d 1264, 1265 (10th Cir. 2008) (holding that "[i]t is improper for the ALJ to pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence.").

Finally, the ALJ stated that Dr. Brown's opinion was inconsistent with Mr. Aceves' functional activities including riding a bicycle, doing housework, managing daily activities and personal care, and participating in metal detecting. However, this statement is factually inaccurate. The record is well-documented that Mr. Aceves' condition has deteriorated over

14

time, and his pain level worsened. At the administrative hearing held in June 2017, Mr. Aceves testified that he no longer rides a bicycle nor does any metal detecting due to his pain. He also testified that he only cooks simple meals and his niece assists him with household cleaning. (**#11-2 at 48, 54-55, 57**). Further, in his written statement, Mr. Aceves reported that he is in constant pain when he attends to his personal care and household activities. (**#11-6 at 266-268**). Indeed, the record contains numerous examples of Mr. Aceves' efforts to relieve his pain through treatment, medication, physical therapy, and reduction of daily activities. Thus, to the extent that Dr. Brown opined that Mr. Aceves suffered from chronic pain, the record supports her opinion.

Although some of the specific evidence cited by the ALJ is relevant to the assessment of Dr. Brown's opinion, her opinion is not inconsistent with specifics cited by the ALJ. Thus, the ALJ's Decision fails to state specific and legitimate reasons sufficient to conclude that Dr. Brown's opinion is inconsistent with substantial evidence in the record. As a consequence, Dr. Brown's opinion is controlling and the failure to adopt her functional limitations constitutes reversible error. Even if not controlling, insufficient justification is given for according little comparative weight to the opinion.

The Court finds the Decision's rejection of Dr. Brown's 2015 opinion contravenes applicable legal standards and that the ALJ's RFC and disability conclusions at step three and four of the sequential analysis are not supported by substantial evidence. Thus, the finding that Mr. Aceves is not disabled is reversed, and the matter is remanded for reconsideration on steps three, four, and potentially five of the sequential analysis, applying the proper legal standards to the opinion of Dr. Brown and engaging specifically in a determination of whether her 2015

medical opinion is entitled to controlling or deferential weight. *See Langley*, 373 F.3d at 1119; *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). Thus, the Court need not reach Mr. Aceves' other specific claims of error in the ALJ's analysis. The Court expresses no opinion as to the ultimate determination of whether Mr. Aceves is or should be found to be disabled.

## V. CONCLUSION

For the foregoing reasons, the Commissioner's decision is **REVERSED AND REMANDED**. Judgment shall enter in favor of Mr. Aceves.

Dated this 3rd day of September, 2019.

**BY THE COURT:**

_____

Marcia S. Krieger
Senior United States District Judge